# EXHIBIT 1

# LEAVING MONEY ON THE TABLE: DO INSTITUTIONAL INVESTORS FAIL TO FILE CLAIMS IN SECURITIES CLASS ACTIONS?

## JAMES D. COX[*]
## RANDALL S. THOMAS[**]

Commencing two decades ago, and continuing today, the institutional investor is the most significant focus in reform efforts for securities markets and the American corporation. Whether the question is the type of disclosures that must be made in connection with a public offering,[1] the scope of nonpublic offerings,[2] or making the corporation more responsive to owners,[3] the focus is on the significant trading and ownership interest of institutional investors. As is well understood, such emphasis on financial institutions in reforming corporate and securities laws is based upon their ownership of, and trading in, the stock of publicly held corporations. For example, financial institutions own nearly 50% of the equity securities listed on the New York Stock Exchange (NYSE) and account for approximately 75% of the daily trading volume on the NYSE.[4] The ownership and trading

---

[*] Brainerd Currie Professor of Law, Duke University School of Law.

[**] Professor of Law, Vanderbilt University Law School.

We would like to thank Edward Labaton, the Institute for Law and Economic Policy, and its members for their assistance in gathering the data used in this project. We gratefully acknowledge the research assistance of Carl C. Carl, Katherine Knight Schultz, and Jian Wang.

1. The SEC's integrated disclosure procedures and shelf registration process is heavily dependent upon the view that the securities of companies eligible to use the integrated disclosure system are traded in an efficient market. *See* Adoption of Integrated Disclosure System, Securities Act Release No. 33-6383 (Mar. 3, 1982), 47 Fed. Reg. 11,819 (Mar. 19, 1982); Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 109 (Summer 2000). That determination in part rests upon a belief that institutional investors are both significant traders and owners of such securities.

2. Though Rule 144A is technically a resale exemption, not an issuer exemption, it was developed to facilitate capital raising by issuers by permitting securities to be effectively syndicated to financial institutions, qualified institutional buyers, who are generally defined as an entity having a securities portfolio of at least $100 million. Institutional investors also are swept within the definition of an accredited investor to whom the issuer has no obligation to provide investment information as a condition of selling its securities. *See* 17 C.F.R. § 230.502(a) (2001) (Securities Act Rule 502(a)); 17 C.F.R. § 230.506 (2001) (Securities Act Rule 506).

3. *See, e.g.,* Bernard S. Black, *Agents Watching Agents: The Promise of Institutional Investor Voice*, 39 U.C.L.A. L. REV. 811 (1992); John C. Coffee, Jr., *Liquidity Versus Control: The Institutional Investor as Corporate Monitor*, 91 COLUM. L. REV. 1277 (1991). *Cf.,* Edward B. Rock, *The Logic and (Uncertain) Significance of Institutional Shareholder Activism*, 79 GEO. L.J. 445 (1991).

4. At the close of the third quarter of 2001 financial institutions held 50.8% of all publicly traded equities. *See* NYSE Fact Book 2000, at 61 (citing Federal Reserve Board "Flow of Funds," *available at* www.federalreserve.gov). The best indication of the overall volume of institutional

percentages are equally high for securities listed on the North American Securities Dealers Exchange (Nasdaq).[5]

Though we also champion the vast potential that has been accorded institutional investors, we examine here one area where financial institutions are claimed to be guilty of passivity equal to that of the "small investors": do financial institutions fail to submit claims for their losses in settled securities class actions? In other words, do institutions frequently leave money on the table that is theirs for the asking?

## I. THE UNEVEN ROLE OF THE INSTITUTIONAL INVESTOR IN PROSECUTING SECURITIES CLASS ACTIONS

In their now classic article, Professors Elliott Weiss and John Beckerman marshalled data collected from eighty-two class action settlements to reveal that the fifty largest claimants in these class actions had an average allowed loss of $597,000 and accounted for 57.5% of the total allowed loss.[6] More significantly, the largest and the second-largest claimants accounted for 13.1% and 6.7%, respectively, of the total recognized losses of a subset of twenty class actions within their overall sample.[7] From this finding, Weiss and Beckerman argued that judges considering settlements in securities class actions should harness the economic self-interest of such a larger claimant(s) by designating those with significant losses as the suit's lead plaintiffs.[8] Doing so would address the broadly recognized concern that class actions are "lawyer driven," and that it is the economic interests of the classes' attorneys, not the classes' representatives, that decide such important issues as whether the claim should be prosecuted, settled, or pursued to the next level.[9] Though

---

trading is the data regarding "block" trades, i.e., trades of a least 10,000 shares for an individual stock. For 2001, block trades represented 48.1% of total trading volume on the NYSE, a decline however from a high of 57% in 1995. *Id.* at 99. More generally, see Jerome Markam, *Protecting the Institutional Investor—Jungle Predator or Shorn Lamb,* 12 YALE J. ON REG. 345, 347-48 (1995).

5.  The data set forth *supra* note 4 regarding institutional holdings of traded equities does not distinguish between NYSE- and Nasdaq-listed securities. However, Nasdaq reports that at the end of 2000 some 40.3% of the Nasdaq National Market Securities was held by institutions (whereas institutions owned 37.8% of all Nasdaq-traded securities, which rises to 47.4% when measured by value). http://www.marketdata.nasdaq.com/asp/Sec4TSO.asp. Block trades represent 25% of the trading volume in Nasdaq National Market Securities. *See* http://www.marketdata.nasdaq.com/asp/Sec4Blockvol.asp

6.  Elliott J. Weiss & John S. Beckerman, *Let the Money Do the Monitoring: How Institutional Investors Can Reduce Agency Costs in Securities Class Actions,* 104 YALE L.J. 2053, 2089 (1995).

7.  *Id.* at 2090.

8.  *Id.* at 2105-09.

9.  The literature on this point is vast. *See, e.g.,* John C. Coffee, Jr., *Rescuing the Private Attorney General: Why the Model of the Lawyer as Bounty Hunter Is Not Working,* 42 MD. L. REV. 215 (1983); John C. Coffee, Jr., *Understanding the Plaintiff's Attorney: The Implications of Economic*

Weiss and Beckerman reasoned that courts had the inherent power to take such steps, Congress decided not to leave such matters to the individual judgment of the presiding judge. Thus, with the enactment of the Private Securities Litigation Reform Act of 1995 (PSLRA),[10] formal procedures for the appointment of a lead plaintiff were mandated for securities fraud class actions.

Section 21D(a)(3) of the Securities Exchange Act[11] sets forth the procedures and criteria for the appointment of lead plaintiffs. Within twenty days of the filing of the complaint, notice must be published "in a widely circulated national business-oriented publication or wire service" inviting class members to apply to be the suit's representative.[12] Not later than ninety days after the publication of such notice, the court must appoint a lead plaintiff from those who have applied.[13] The most significant factor supporting a presumption of who is the "most adequate plaintiff" is the claimant that "has the largest financial interest" in the suit.[14] The next provision underscores the strength of this presumption by providing that it can only be overcome by proof that the party having the largest financial interest will not adequately represent the class or is subject to unique defenses.[15]

Thus far, the debate surrounding the selection of a lead plaintiff has focused on the propriety of aggregating investor losses so as to enjoy the benefits of the before-described presumption.[16] This, of course, is not just a

---

*Theory for Private Enforcement of Law through Class and Derivative Actions*, 86 COLUM. L. REV. 669 (1986); Jill E. Fisch, *Class Action Reform: Lessons from Securities Litigation*, 39 ARIZ. L. REV. 533 (1997); John Macey & Geoffrey Miller, *The Plaintiffs' Attorney's Role in Class Actions and Derivative Litigation: Economic Analysis and Recommendations for Reform*, 58 U. CHI. L. REV. 1 (1991); Randall S. Thomas & Robert G. Hansen, *Auctioning Class Action and Derivative Lawsuits: A Critical Analysis*, 87 NW. U. L. REV. 423 (1993).

10.  Private Securities Litigation Reform Act of 1995, Pub. L. No. 104–67, 109 Stat. 937 (1995).

11.  15 U.S.C. § 78u-4(a)(3) (2001).

12.  Section 78u-4(a)(3)(A)(i). Additional notice can be required by the presiding court. *Id.* at § 78u-4(a)(3)(A)(ii).

13.  Section 78u-4(a)(3)(B)(i).

14.  Section 78u-4(a)(3)(B)(iii)(I). The other two factors listed are that the designee was the party to the original complaint or petitioned to be the lead plaintiff and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." *Id.* Since any plaintiff must meet the latter requirement, and the court is unlikely to be disposed to seek out a representative who is not before it, the relative size of the claimant naturally becomes the determining factor of whether the presumption applies.

15.  Section 78u-4(a)(3)(B)(iii)(II).

16.  *See, e.g.*, Jill E. Fisch, *Aggregation, Auctions, and Other Developments in the Selection of Lead Counsel under the PSLRA*, 64 LAW & CONTEMP. PROBS. 53, 65-78 (Spring/Summer 2001) (arguing the aggregation weakens the relationship between lead plaintiff and class counsel); R. Chris Heck, Comment, *Conflict and Aggregation: Appointing Institutional Investors as Sole Lead Plaintiffs under the PSLRA*, 66 U. CHI. L. REV. 1199, 1220-21 (1999) (suggesting that courts must restrain

tussle among competing class members but has serious ramifications for the plaintiffs' securities bar. Under the PSLRA, the lead plaintiff, subject to the approval of the court, has the power to select and retain counsel.[17] Any doubt about a class counsel's stakes regarding who is the lead plaintiff was resolved by In re *Microstrategy, Inc. Sec. Litig.*,[18] where initially Mr. Mazza was appointed lead plaintiff because he had the greatest loss among the five applicants.[19] Mr. Mazza's selection of Firm *A* as class counsel was approved.[20] Later, he withdrew as lead plaintiff for personal reasons.[21] Thereafter, following motions to be appointed as lead plaintiff to replace Mr. Mazza, the Minami family and Local 144 Nursing Home Pension Fund were appointed co-lead plaintiffs.[22] The Minami family's losses of $900,000 were the greatest among the other petitioners, and Local 144's losses of $600,000 were deemed to qualify it as co-lead plaintiff.[23] They each had their own choice of counsel: Firm *B* for the Minami family and Firm *C* for Local 144.[24] Both requests were approved by the court, with the effect that the Firm *A* ceased to be engaged in the suit[25] and could only watch from the sidelines as the parties entered into a subsequent settlement that ultimately resulted in the new class counsel being awarded $27.6 million.[26] Thus, who is the lead plaintiff matters, and matters a lot, to the attorneys who seek to represent the class.

Because class counsel appointments depend upon who is selected as the lead plaintiff,[27] the lead plaintiff provision effectively stimulates a tournament among competing attorneys to identify themselves with investors whose losses are so significant that they may qualify as the most adequate plaintiff. As such, the lead plaintiff provision has not eliminated the strong

---

aggregation to avoid lawyers assembling groups in ways that restore control over the litigation to themselves).

17. Section 78j-4(a)(3)(B)(V).
18. Fed. Sec. L. Rep. (CCH) ¶ 91,632 (E.D. Va. 2001).
19. *Id.* at 97,726 n.10.
20. *Id.*
21. *Id.*
22. *Id.*
23. *Id.*
24. *Id.*
25. *Id.*
26. *Id.* at 97,740 n.37.
27. And, with the decision in *In re Cendant Corp. Sec. Litig.*, 264 F.3d 201 (3d Cir. 2001), the lead plaintiff is all the more important in identifying who will be class counsel. *Cendant* held that in most instances where the court has appointed a lead plaintiff, it would be inappropriate for the trial court to select counsel through a competitive bidding process. Prior to *Cendant*, many courts severed the process of appointing lead plaintiff from the selection of counsel and discharged the latter responsibility by inviting interested firms to engage in competitive bidding. *See generally* Fisch, *supra* note 16, at 78-95.

interest of class counsel in the initiation of securities class actions; they remain lawyer-driven notwithstanding the PSLRA.[28]

Table 1 presents the results of our search of the Westlaw ALLFED library database for opinions bearing on courts' appointments of lead plaintiffs. Between January 1, 1996, and December 15, 2001, we found thirty-six reported opinions dealing with the presiding court's selection of a lead plaintiff.

Table 1

SUMMARY OF FIVE-YEAR HISTORY OF SELECTING LEAD PLAINTIFF

| | |
|---|---|
| Cases without an Institutional Petitioner | 11 |
| Cases with Competing Institutional Petitioners | 12 |
| Cases with Single Institutional Petitioner and Institutional Petitioner Selected | 8 |
| Individual/Group Selected Over Institution | 5 |

The above data seems to show that when there is a contest between a financial institution and an individual, or group of individuals, vying to be the lead plaintiff, the institution generally is determined to be the most adequate plaintiff. In twenty out of twenty-five cases where institutions applied to be lead plaintiffs, they were selected. However, our curiosity is piqued by the absence of a petitioning institutional investor in one-third of our sample. We also wonder what happened in the five instances in which the court selected a group of individuals over the petitioning institution.

Our intuition is that, on average, institutional investors are more likely to trade significantly larger blocks of shares than individuals over time. We further speculate that institutional trading overall is more likely to represent a significant percentage of the trading in a company's shares during the class action interval in a securities fraud settlement. If this so, why then do we see that in a significant portion of the reported decisions appointing a lead plaintiff, there is not any financial institution seeking to represent the class? And, in the few instances where a group of individuals was preferred over a petitioning financial institution, why were they preferred? Why were there not other financial institutions who sought to be appointed that had larger losses, larger than both those of the institution that did petition and also those

---

28. *See, e.g.*, In re Razorfish, Inc. Sec. Litig., 143 F. Supp.2d 304 (S.D.N.Y. 2001) (describing the contest among law firms who competed to be counsel for a securities class action by advancing their respective candidates to be the lead plaintiff. The court concluded that "the instant case illustrates ... securities class litigation continues to be lawyer-driven in material respects and the reforms Congress contemplated in the Reform Act can be achieved, if at all, only with some help from the courts"). *Id.* at 307.

of the group of individuals ultimately appointed lead counsel?

In section IV, we further address these concerns indirectly, by examining another phenomenon: whether institutions not only fail to step up to be a lead plaintiff, but whether they also fail to submit claims to the settlement administrator who is dispensing funds from settled securities class actions. However, we first need to make clear the institutional investors' obligations, or lack thereof, to file suit or make claims in these cases.

## II. THE INSTITUTIONAL INVESTOR AS A FIDUCIARY

What are the legal compulsions for the institutional investor to petition to be a lead plaintiff? To file a claim in a settled case? Should the institutional investor on both counts just stay in bed? When the institutional investor, such as an investment bank, acts for its own account, it has no obligation except the general social obligation to take care of itself without being a burden to others. Thus, it might refuse to harness its self-interest to the prosecution of the securities class action. And should it choose not to file a claim when the case is settled, its slovenly action is celebrated by other class members because there is more money to distribute to them. However, typically institutional investors are acting as representatives for others. As such, they are easily classified as fiduciaries. The source of this obligation varies from institution to institution, but as will be seen, their obligation to file claims in settled securities class actions appears not to vary. This fiduciary command, however, falls on the fund's managers, not on the institution itself.[29]

### A. Private Pension Funds

Since 1974, the fount of private pension funds managers' fiduciary obligations has been the Employee Retirement Income Security Act (ERISA), which, among other features, sets forth certain fiduciary obligations.[30] The fiduciary obligation provisions of ERISA are a central aspect of its protections of employee benefit rights.[31] The exact boundaries of ERISA's fiduciary requirements are decided within its broad command in

29.  See Weiss & Beckerman, supra note 6, at 2112 ("It is the managers of the institutional investors, not the institutions themselves, that are fiduciaries."). On the general topic of the fiduciary responsibilities of the institution as a lead plaintiff, see Craig C. Martin & Matthew H. Metcalf, The Fiduciary Duties of Institutional Investors in Securities Litigation, 56 BUS. LAW. 1381 (2001).

30.  See 29 U.S.C. §§ 1001-1144 (2001).

31.  See generally Deborah A. Geier, ERISA: Punitive Damages for Breach of Fiduciary Duty, 35 CASE W. RES. 743, 746 (1985). The Act's duties extend not only to one who exercises control over the fund, but also to those who render advice. Id. at 747-48.

section 404 that imposes on managers a duty to use the degree of skill, care, and prudence of a reasonable person "in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."[32]  Though this standard has a similar ring to that found in everyday tort law decisions, it is generally understood that ERISA is even more exacting in its demands than what prevails at common law.[33]  ERISA also imposes an affirmative obligation of loyalty on fund managers by its requirement that these plan fiduciaries must discharge their duties solely in the interests of the fund's participants and beneficiaries.[34]

The fiduciary duty embodied in ERISA can be traced to the common law of trusts and therefore embodies the obligation to preserve and maintain fund assets.[35]  It is on this foundation that Professors Weiss and Beckerman extrapolate an obligation for fund managers to consider initiating suit where necessary to protect, maintain, or reclaim fund property that is the subject of their trust.[36]  Pursuit, however, is not mandated if the manager's decision not to act is reasonably based.  Thus, in *McMahon v. McDowell*, the court held an ERISA fiduciary did not breach its duty to the fund by failing to take steps to enforce a claim, and could even abandon the claim, if the fiduciary reasonably believed that action would be futile.[37]

This holding has significant implications for our interpretation of PSLRA's provisions.  Because the PSLRA bars discovery prior to the court's consideration of the defendants' motion to dismiss, the information bearing on the suit's merits that is available even to the most sophisticated investor is extremely limited.[38]  Hence, to the extent there are nontrivial costs to an institution from petitioning to become a lead plaintiff, not to mention the uncertainty of whether the institution will be selected, these costs may weigh more heavily than the expected benefits to the institution from the suit, not to mention its participation in the suit.  Thus, though the private pension fund's managers may theoretically face liability for imprudently assessing whether to serve as a lead plaintiff for a securities class action claim, there would be

32.  29 U.S.C. § 1104.

33.  *See, e.g.,* Susan J. Stabile, *Pension Plan Investments in Employer Securities: More Is Not Always Better*, 15 YALE J. ON REG. 61, 71 (1998).

34.  29 U.S.C. § 1104.  The force of each of these duties is underscored by ERISA's provision that damages or equitable relief can be sought against any fiduciary who breaches his or her duties under the Act. *See* 29 U.S.C. § 1109(a).

35.  *See, e.g.,* Central States Southeast & Southwest Areas Pension Fund v. Cent. Trans., Inc., 472 U.S. 559 (1985).

36.  *See* Weiss & Beckerman, *supra* note 6, at 2116.

37.  794 F.2d 100, 110 (3d Cir. 1986).

38.  Randall S. Thomas & Kenneth J. Martin, *Using State Inspection Statutes for Discovery in Federal Securities Fraud Action*, 77 B.U. L. REV 69, 71 (1997).

many potential justifications for them to assume a posture of rational apathy. However, with respect to failing to submit a claim to an administrator in a settled action for proven losses, we think there would be far fewer instances in which apathy would be a reasonable response to its fiduciary obligations.[39]

## B. Public Pension Funds

Though nonfederal public pension funds are specifically exempted from ERISA,[40] the fiduciary obligations that apply to public pension fund managers are no less demanding than the ERISA standards for our purposes. State pension funds are governed by the general state laws pertaining to trusts and investments. In addition, there are special pension fund legislative requirements at the state, county, and even municipal levels.[41] For example, California sets forth fiduciary obligations for its retirement pension fund in its Constitution, embracing a standard very similar to that found in ERISA.[42] By contrast, New York does not have either a constitutional or statutory standard, but because such managers are deemed trustees, they are subject to the common law fiduciary standard that applies to trustees generally.[43] Furthermore, a detailed list of similar fiduciary principles is set forth in the Uniform Management of Public Employee Retirement Systems Act that has now been adopted in sixteen states.[44] Because of the great similarity in the

---

19. *See* Weiss & Beckerman, *supra* note 6, at 2117. To be sure, if the expected payment from the fund was dwarfed by the cost to prepare and submit the claim, the fiduciary, consistent with its fiduciary obligations, could choose not to submit the claim. Beyond this limited instance, it would be difficult to envision bases that would be consistent with the fiduciary being rationally apathetic.

40. *See* 29 U.S.C. § 1003(b)(1) (2001).

41. *See generally* BETTY LINN KRIKORIAN, FIDUCIARY STANDARDS IN PENSION AND TRUST FUND MANAGEMENT (1989).

42. *See* CAL. CONST. art. XVI § 17(c) (2001) ("[D]ischarge their duties . . . with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with these matters would use in the conduct of an enterprise of a like character and with like aims.").

43. *See* Krikorian, *supra* note 41, at 346. *See also* N.Y. RETIRE. & SOC. SEC. LAW §§ 176-79 (McKinney 2001).

44. A trustee or other fiduciary shall discharge duties with respect to a retirement system:
   (1) solely in the interest of the participants and beneficiaries;
   (2) for the exclusive purpose of providing benefits to participants and beneficiaries and paying reasonable expenses of administering the system;
   (3) with the care, skill, and caution under the circumstances then prevailing which a prudent person acting in a like capacity and familiar with those matters would use in the conduct of an activity of like character and purpose;
   (4) impartially, taking into account any differing interests of participants and beneficiaries;
   (5) incurring only costs that are appropriate and reasonable; and
   (6) in accordance with a good-faith interpretation of the law governing the retirement program and

functions performed by public pension fund managers and private pension fund managers, and because of the nearly identical scope of their fiduciary obligations, there is every reason to expect that the obligations of public pension fund managers with respect to pursuing a securities claim will be the same as that for private pension fund managers.[45]

### C.  Mutual Fund Managers

The Investment Company Act of 1940[46] sought to protect investors in registered mutual funds by, among other steps, imposing on the fund advisors and their directors certain fiduciary obligations, as well as by creating a wide range of prophylactic requirements.[47] In addition to the fiduciary obligations imposed by the Investment Company Act, advisors are subject to the demands of the Investment Advisers Act of 1940.[48] Furthermore, the Investment Company Act does not preempt state law fiduciary standards that apply generally to officers and directors of mutual fund companies,[49] so the directors and managers of mutual funds have the same fiduciary obligations to their shareholders as do directors and managers of other corporations.[50] Of special interest here is that the fund's advisor, a vendor of services to the mutual fund company, is seen as having a fiduciary obligation to the fund and to the fund's shareholders.[51] In this respect, mutual funds are quite different from, say, General Motors, whose various suppliers of services and goods are not deemed to have a fiduciary relationship to General Motors'

---

system.
The Uniform Management of Public Employee Retirement Systems Act § 7 (1997), *available at* :http://www.law.upenn.edu/bll/ulc/ulc_frame.htm (visited Feb. 9, 2002). Section 11 of the Act imposes personal liability upon fiduciaries who breach an obligation under the Act.

45.  The Uniform Act's obligations are derived from ERISA and the law of trusts. *See* Steven L. Willborn, *Public Pensions and the Uniform Management of Public Employee Retirement Systems Act,* 51 RUTGERS L. REV. 141, 145 (1998).

46.  15 U.S.C. § 80a-1 et seq. (2001).

47.  *Id.*

48.  15 U.S.C. § 80b-1 et seq. (2001).

49.  *See* Green v. Fund Asset Mgmt., L.P., 245 F.3d 214, 225-26 (3d Cir. 2001) (holding that Congress did not intend by enacting section 36(b) of the Investment Company Act authorizing suits for excessive management fees to preempt state law fiduciary principles that apply to the directors' decision to award excessive compensation).

50.  *See generally* Symposium Panel, *Mutual Fund Regulation in the Next Millennium: I. Fund Governance,* 44 N.Y.L. SCH. L. REV. 431 (2001).

51.  *See* TAMAR FRANKEL, THE REGULATION OF MONEY MANAGERS: THE INVESTMENT COMPANY ACT AND THE INVESTMENT ADVISORS ACT 343 (2000) (suggesting that an advisor has a fiduciary relationship that calls for it to act primarily for the benefit of the other in matters connected to its undertaking). The advisor's duties are determined in this regard by reference to the principles of common law regarding agents, and, because they are closely analogous to brokers, advisors are subject to more demanding standards than agents. *Id.* at 372.

stockholders.

So understood, the mutual fund's directors, officers, and advisors are all subject to a fiduciary duty to not act negligently, although negligence in this context involves some element of intent such that the standard is more akin to that of recklessness.[52] Nevertheless, the objective standard applied remains that of the level of skill and prudence that the reasonable person would exercise in a similar undertaking for a similar institution.[53]

*D. Insurance Company Managers*

Insurance companies are exempt from the Investment Company Act[54] and are instead regulated by state insurance codes and commissioners.[55] Most states do not impose a fiduciary obligation on insurance companies to their policyholders; fiduciary duties do exist on the part of directors and officers to shareholders for nonmutual insurance companies.[56] This said, some courts nevertheless have recognized that some functions are trustee-like and have imposed fiduciary obligations on the insurance company's management when performing tasks such as collecting premiums and managing company funds.[57] Under this view, imprudence in pursuing assets that belong to the insurance company would constitute a breach of fiduciary duties if company reserves are reduced because of management's lack of prudence.

When the insurance company has stockholders, the fiduciary demands on its directors and officers should be the same as with any corporation. Subsumed within the corporate directors' and officers' fiduciary obligations is the duty to be attentive to acts or practices that will harm the corporation.[58]

---

52. *Id.* at 645-46.

53. *Id.* at 657-58.

54. *See* Section 3(c)(3), 15 U.S. C. § 80a-3(c)(3) (2001).

55. This arrangement reflects the impact of the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015 (2001), which exempts insurance companies from most federal regulatory provisions, except the antitrust laws.

56. *See* Theodore Allegaert, Comment, *Derivative Actions by Policyholders on Behalf of Mutual Insurance Companies*, 63 U. CHI. L. REV. 1063, 1071 (1996).

> The relationship between mutual insurance policyholders and their company derives historically from statutes under which mutual companies are chartered and from the contractual terms of issued policies. Incident to membership in a mutual company, the policyholder acquires certain proprietary interests, yet these interests are not fiduciary and certainly are not akin to partnership. In addition, membership places the policyholders in a creditor-like contractual relationship with the company.

*Id.*

57. *See generally id.* at 1072.

58. Consider here the observation of *In re Caremark Int'l, Inc., Derivative Litigation* by Chancellor William Allen:

> [A] director's obligation includes a duty to attempt in good faith to assure that a corporation

To this end, there is a well-recognized obligation for boards of directors to assure compliance systems and standard operating procedures that are reasonable given the nature of the firm's activities.[58] This obligation is heightened by the general awareness that class action settlements frequently yield large awards to financial institutions, such as those described by Weiss and Beckerman. Thus, it is not a big step to conclude that just as the mutual funds (and insurance companies) must assure the safety of the securities that are within the firm's portfolio, they should also assure that appropriate procedures are in place to claim material amounts that may be due the mutual fund (or insurance company) in a class action settlement. What is material is a relative inquiry. In the context of filing a claim with a settlement administrator for a settled class action, it would seem that materiality is best assessed in terms of the relationship between the cost of submitting the claim and the expected payment from the settlement. The costs of filing such claims appear at first blush to be trivial, and therefore we would expect most funds that traded during the class period to seek a recovery.

On the other hand, there are many more persuasive reasons that can support the directors' or officers' decision not to become a lead plaintiff. There is a question of the resources required to see that task through to the end. Those without experience in such matters may easily overestimate the burdens of being a lead plaintiff. Or they may correctly estimate that, given the firm's limited resources, the expected benefits of such intervention on its part are on average insufficient reward for the effort entailed. Also, there are distinct advantages to free-riding on the efforts of others. If there is no reason to believe that the firm's position will be improved by pursuing recovery as the lead plaintiff, rational apathy is both efficient and understandable.[60]

---

information and reporting system, which the board concludes is adequate, exists, and that failure to do so under some circumstances may, in theory at least, render a director liable for losses caused by noncompliance with applicable legal standards.
698 A.2d 959, 970 (Del. Ch. 1996). *See generally* JAMES D. COX ET AL., CORPORATIONS § 10.4 (2002).

59.   *See, e.g. In re* Caremark, 698 A.2d at 970.

60.   A less acceptable reason is suggested by WILLIAM M. O'BARR & JOHN M. CONLEY, FORTUNE AND FOLLY: THE WEALTH AND POWER OF INSTITUTIONAL INVESTING (1992). Their study of the culture of selected financial institutions found that, with the exception of public pension funds, managers were sensitive to the fact that their employer was or could be a vendor of products that the class action defendant consumes. Hence, a visible participation in the suit would seriously jeopardize the company's, bank's, or insurer's long-term interests.

### E. Bank Common Trust Funds

Common trust funds operated by banks are exempt from the Investment Company Act of 1940,[61] but their managers are subject to the common law fiduciary duties of trustees. Though the specifics of a trustee's fiduciary duty varies from state to state, the American Law Institute's Restatement of Trusts captures the position adhered to by most of the states:

> A fiduciary has a duty to take reasonable steps to realize on claims that are the property of the trust ... but should do so only when she believes that the probable benefit to the trust will exceed the costs the trust reasonably can expect to incur. On the other hand, a fiduciary cannot properly abandon claims affecting the trust property unless it reasonably appears that a suit would be futile or the expense of litigation or the character of the claim would make it reasonable not to bring suit.[62]

In short, the obligations of the bank trustee are no different from those we have seen apply to other fiduciaries.

### F. Synthesis: Institutions Are Normally Obligated to File Claims in Securities Settlements, But May Rationally Choose Not to Be Lead Plaintiffs

Felix Frankfurter's famous observation regarding fiduciaries[63] underscores the opacity that surrounds the meaning and, more particularly, the demands of being a fiduciary. Whatever the vagueness of fiduciary obligations in other contexts, in the context of the institutional investor's obligations to its investors, beneficiaries, policyholders, etc., there is amazing uniformity. Though such institutions cannot abandon without reason a claim against a third party, financial institutions are not under an affirmative obligation to pursue inchoate claims. The speculative nature of the claim, coupled with the uncertainty that the institution's decision to serve as a lead plaintiff will make a difference, makes apathy the reasonable and rational

---

61. _See_ 15 U.S.C. § 80a-3(c)(3) (2001).

62. Weiss & Beckerman, _supra_ note 6, at 2113 (citing Restatement of Trusts, Second, § 177, 192).

63. _See_ Sec. Exch. Comm'n v. Chenery Corp., 318 U.S. 80 (1943).

[T]o say that a man is a fiduciary only begins analysis: it gives direction to further inquiry. To whom is he a fiduciary? What obligations does he owe as a fiduciary? In what respect has he failed to discharge these obligations? And what are the consequences of his deviation from duty? _Id._ at 85-86.

course much of the time.

But when the claim is no longer inchoate, so that money is to be received by submitting proof of the institution's trading during the fraud interval, the justifiable bounds of rational apathy are seriously constricted. The benefits of filing and perfecting these claims are much more concrete, especially when the fund managers are gauging their performances in comparison to market benchmarks. What is then a reasonable course of action should be guided again by comparing the costs to submit the claim with the expected award from the settlement, but we expect this to be a one-sided calculation in favor of filing for any actively trading institution.

### III. PUTTING THE ODOR OF MONEY IN THE AIR: THE PROCEDURAL ASPECTS OF NOTIFYING CLAIMANTS

Settlements of securities class actions require the approval of the court. The truly final disposition of the case occurs when the settlement administrator, who is either appointed by the court or simply selected by the suit's attorneys, submits its report of how the settlement was distributed. The settlement administrator earns its fees not by simply writing checks, but also by its extensive efforts to assure that all reasonable efforts have been taken to give potential claimants notice of the settlement and how those investors can submit their claims so as to be eligible to participate in a settlement.

Professional settlement administrators for class actions always face a challenging task in distributing settlement funds to those entitled to be members of the class. In securities class actions, not only is there the serious administrative task of assuring that those filing claims are entitled to participate in the settlement,[64] but imparting notice of the settlement to class members is also difficult. Giving notice to potential class claimants is complicated by several factors.[65]

The first step customarily followed by the settlement administrator is obtaining from the transfer agent for the security's issuer the list of registered stockholders. However, if the issuer is bankrupt or otherwise not in existence

---

64.  This task is further complicated when the terms of the settlement provide for differing recoveries within the class action period based upon when a particular claimant's securities transaction occurred.

65.  The following description of the steps settlement administrators pursue is based on numerous conversations the authors have had with several administrators. *See also* Aff. Brian Burke, *In re* Health Mgmt. Systems Sec. Litig. (S.D.N.Y. 2001); Aff. Ellen Riley, *In re* Physicians Computer Network, Inc. Sec. Litig. (D.N.J. 2000); Aff. Shandarese Garr, in *In re* Engelhard Sec. Litig. (D.N.J. 2000); Aff. Ellen Riley, Alpern v. Utilicorp United, Inc. (W.D. Mo. 2000); Aff. G. Peter Buchband, Wright v. BT Office Products Int'l, Inc. (S.D.N.Y 1999); Aff. G. Peter Buchband, State of Wis. Board v. Goldfield (D.N. Tex. 1999).

at the time of the settlement, the transfer agent generally possesses no reliable records. In any case, settlement administrators do not rely solely on the transfer agent's records when such records are available. Because most investors hold their securities in street names, the list of registered holders from the transfer agent will report a significant number of holders as CEDE & Co., the depository for most brokers. The settlement administrator maintains in its database a list of over 2000 brokers that participate in the Depository Trust Company (the so-called DTC Participant List).[66] Using the DTC Participant List, the settlement administrator forwards to each such broker a notice of settlement, generally with a special notice asking that the broker assist in informing its customers who possibly are included in the settlement. The brokers respond by identifying the addresses of their customers whose trading occurred during the class action period. They then either provide a printed or electronic version of the customers' addresses or forward labels with the customers' addresses. Some brokers prefer to circulate the claims notices directly to their customers and, therefore, obtain from the settlement administrator an ample supply of settlement notices that the broker can then forward directly to the appropriate customers. Institutional investors who prefer anonymity may not be totally visible to the settlement administrator during this stage of the administrator's work. For example, an institution that depends upon an advisor or advisors to file the required Form 13F may not be directly identified to the settlement administrator so that the notice of settlement is directed to the advisor and not to the institution itself. When this occurs, the ball is in such advisor's court. Just as for the broker whose customer holdings are recorded in street name, the advisor has an obligation to forward the settlement notice to the institution. Thus, the notices of settlement that are circulated customarily request that the notice be directed to the securities' beneficial owners, if other than the advisor.[67] A further step of circulating notice is the publication of the settlement notice in the national media, such as *The Wall Street Journal, Financial Times, USA Today,* or *Investors Business Daily.*

The reader should be impressed with the steps taken by settlement administrators to assure that those investors with claims learn of them and submit proof of their claim to the administrator. Assurance that their steps are reasonable occurs at several levels. First, all aspects of the settlement are

---

66. This list is updated annually by the Depository Trust Company (DTC).

67. Note that the settlement administrator does not know ex ante that the advisor's listed holdings are held solely as an agent for another, although there is more than ample reason to expect this is true a significant percentage of the time. Thus, the settlement administrator's request that the settlement notice should be forwarded is couched in less than mandatory language.

subject to the court's watchful eye. Though some judicial eyes are sharper than others, the settlement administrators have learned to apply the highest standards consistently across all settlements. Courts customarily ask the administrator to set forth in writing all of the steps they have taken to assure that potential claimants are duly informed. Second, the steps followed by settlement administrators parallel in many respects those required by the Securities and Exchange Commission (SEC) in an analogous area, the distribution of proxy materials, annual reports, and other company notices to investors.

The SEC has long toiled in meeting the challenge of assuring that company communications—particularly proxy statements—could reach the company's beneficial owners.[68] With 70% and 80% of all outstanding shares held in street name,[69] the SEC's task is a formidable one. To assure that corporate releases reach those who have an economic stake in the company, the SEC rules impose a series of responsibilities upon banks and brokers who hold shares as nominees for the beneficial owners.[70] The baseline requirement is that companies registered under either the Securities Exchange Act or the Investment Company Act of 1940 must, at least twenty days before the record date for a meeting, employ a search-card procedure whereby they ask the nominee (broker, bank, or other party) to tell them the number of copies of the company proxy materials they need in order to send them to all of the beneficial owners the nominee represents.[71] Nominees are also required to identify the number of shares owned by each beneficial

---

68.  For a complete analysis of the history and details of the SEC's regulation in this area, see RANDALL S. THOMAS & CATHERINE T. DIXON, ARANOW & EINHORN ON PROXY CONTESTS FOR CORPORATE CONTROL (3d ed. 1999).

69.  *See, e.g.,* Exchange Act Release No. 34-38406 (Mar. 14, 1997), 62 Fed. Reg. 13,922 (Mar. 24, 1997). Legal title is customarily recorded in the name of CEDE & Co., the nominee of Depository Trust Company, an entity that owes much of its existence to the efficiency of not depending upon individual owners to physically delivery share certificates to an intermediary each time the securities are sold.

70.  As originally enacted, section 14(b) of the Securities Exchange Act conferred upon the SEC very general rule-making authority regarding the obligations of broker-dealers with respect to proxy solicitations of their customers' shares in companies listed on a national securities exchange. A 1964 amendment not only expanded the scope of the SEC's authority to over-the-counter securities but clarified that its authority included "requiring ... broker-dealers to transmit proxy solicitation materials to their customers ...." *See* Pub. L. No. 88-467, 78 Stat. 565, 88th Cong., 2d Sess. (1964). The final expansion occurred in 1985 when its authority was extended to banks. *See* Pub. L. No. 99-222, 99 Stat. 1737 (1985).

71.  Exchange Act Rule 14a-13(a), 17 C.F.R. 240.14a-13(a) (2001). Banks frequently are themselves but nominees of other banks who are nominees of another bank or the beneficial owner. This results in a "piggyback" system whereby each bank nominee has one day to respond by identifying their respondent bank. *Id.*

owner.[72]

Direct mailings of routine annual reports by the company to many beneficial owners are also possible if the company has compiled lists of nonobjecting beneficial owners.[73]

Thereafter, the issuer may mail its materials directly to any nonobjecting stockholders and provide the nominee with a sufficient number of the materials to be forwarded to the objecting owners.[74] Alternatively, the issuer may provide the nominee with enough sets of the materials for all the owners it represents, whether they are objecting or non-objecting holders.[75] As part of this process, the SEC has imposed an affirmative obligation upon the brokers and banks that serve as nominees to forward to these beneficial owners the proxy statements and other information given to them by the issuer, and to respond to requests by the issuer to provide a list of the nonobjecting beneficial owners.[76]

There is no statutory mandate for the settlement of class actions equivalent to the mandate in Section 14(b) of the Securities Exchange Act with respect to the circulation of a notice of settlement. Nevertheless, the fiduciary relationship between customers, whether widowers or large financial institutions, and their broker-advisors embodies an affirmative command that the notices be forwarded to the beneficial owners. Moreover, settlement administrators pursue additional steps to assure that all possible participants in a settlement receive notice of a claim, not the least of which is publishing notice of a settlement in the national press. To be sure, advisors might not forward the notice, and beneficial owners may turn a blind eye to the reality that securities class actions are prevalent and that significant funds are regularly distributed to institutional claimants in such settlements.

### IV. DO INSTITUTIONS FILE CLAIMS IN SECURITIES FRAUD SETTLEMENTS?

In recent months, there have been allegations raised in the popular press and elsewhere that institutional shareholders are giving up "hundreds of millions of dollars in class action settlements for which they are eligible simply by neglecting to file claims."[77] These claims, however, are based

---

72. *Id.*
73. Exchange Act Rules 14b-1, 17 C.F.R. 240.14b-1 (2001), and 14b-2, C.F.R. 240.14b-2 (2001), govern this process.
74. Exchange Act Rule 14a-13(b), 17 C.F.R. 240.14a-13(b) (2001).
75. *Id.*
76. Exchange Act Rule 14b-1, 17 C.F.R. 240.14b-1 (2001) (broker-dealers) and Rule 14b-2, 17 C.F.R. 240.14b-2 (2001) (banks).
77. *See, e.g.,* Christiane Bird, *Pension Funds Miss Out on Much Cash by Failing to File in Class-*

largely on "informal and anecdotal evidence," although there has been at least one attempt by the National Association of State Auditors, Comptrollers and Treasurers to collect survey data from a broad sample of institutions.[78] This survey showed that about one-third of the thirty-three respondent institutions had made no recovery of any asset losses in the prior five years, a time period in which more than 700 securities class action cases were settled.[79] Given the enormous share of the stock market that is held by institutional shareholders (25% for public pension funds and another 35% by corporate funds) and the tremendous amount of money available in these settlements (estimated at $8.39 billion over the past three years), a logical inference from these responses is that it is "highly unlikely any significant public fund invested in the market could possibly have been ineligible to participate in class action recoveries through this 5-year span."[80] In other words, it appears, based on the limited evidence compiled to date, that some institutional investors are not filing claims in securities fraud class action settlements and are therefore leaving potentially large sums of money on the table.

In this section, we explain our efforts to develop a data set that can be used to test these claims. First, we explain how we collected our data and some of the strengths and limitations of the sources that we have used. Then, we give some very preliminary results based on the small number of settlements that we have been able to obtain sufficient information about to date.

### A. The Data

In order to get a better sense of how many institutions are both eligible to make claims and actually do perfect such claims in these settlements, we needed to first generate a sample of securities fraud settlements. We enlisted the aid of three settlement administrators to help us identify a group of securities fraud class action settlements and asked them to send us the settlement notices from these cases. We used these notices to gather a wide variety of information about these cases, including the identity of the lead plaintiff for post-PSLRA cases, and the class period for each case.

We then set about generating two additional types of data. First, for each

---

*Action Cases*, WALL ST. J., Sept. 4, 2001, at A10.

  78.  *Id.*

  79.  ALAN P. CLEVELAND, CLASS ACTION CLAIM MANAGEMENT: A FIDUCIARY MANDATE (2001) (mimeo on file with author).

  80.  *Id.*

settlement for which we received a settlement notice, we considered the company settling the case as a potential member of our sample. For each sample company, we needed to determine which institutions held stock in the company at the beginning of the class period, and which institutions traded in the company's stock over the fraud interval. To do this, we used data taken from Form 13Fs filed by institutional investors. In particular, we used the Spectrum 3 database, which lists each company for which institutional investors have reported stock ownership, the names of those institutional investors that reported holding the company's stock, the size of the institutions' share holdings in each quarter, and the changes in these institutions' share holdings on a quarterly basis during the class interval. For those sample companies that were listed in Spectrum 3, we extracted this information and used it to create a spreadsheet that reflected all of the institutions reporting trades—and the size of those trades—in the sample company during the class period.[81]

The reporting institutions for Form 13F include a very broad group of organizations. The list not only includes the types of financial institutions whose general fiduciary obligations were earlier examined in Part II—private and public pension funds, mutual funds, insurance companies, and bank common funds—but also hedge funds, foundations, endowments, and even partnerships. This means that our sample includes a wide range of different types of institutional investors, allowing us to determine if different groups of these investors vary in the frequency with which they file claims in these cases.

We realize that our reliance on data reported in Form 13Fs as our source of information about institutional shareholders' stock ownership and trading is subject to several criticisms, including that institutions often delay reporting changes in their holdings on a timely basis, and that they may not report all changes in their stock holdings. Equally limiting is that the Form 13F is frequently filed by an advisor to the financial institution under the advisor's name and not under the name of the institution.[82] These problems may in part be a result of the SEC's failure to review these filings and the lack of financial or other penalties for late or inaccurate institutional filings.

However, in the end, this is the only publicly available data source on institutional shareholder stock ownership in individual companies. The only alternative way of generating the data that we need on holdings and changes in holdings is to ask those institutions that held shares in the sample

---

81.  Some companies were not listed in Spectrum 3, and are therefore not included in our sample.
82.  Moreover, advisors can, and frequently do, serve more than one institution and as a matter of expediency aggregate their holdings for all advisees when reporting on Form 13F.

companies to provide us with this information directly, if they still have it. While we may choose to pursue this avenue farther down the road, at the moment we must be content with using the Spectrum 3 data to determine whether institutional investors have potential claims that they should file in these settlements.

After we generated a list of the institutional investors that held stock in the sample companies and traded in the stock during the class interval, we examined our data to see if these institutions filed claims in the securities class action settlements. We asked the three settlement administrators that had provided us with the notices of settlements if they would be willing to help us determine if the institutions that we had identified as potential claimants actually filed claims in the settlements that they administered. We provided them with our spreadsheets listing the institutions that we had identified as trading stock in the sample companies during the class period and asked them to compare our list with the list of claimants in their databases so that we could determine how well the two data sets matched one another.

One problem with this methodology is that some institutional investors use third-party advisors as money managers to manage some or all of their portfolio. In these circumstances, the third-party advisors will often be responsible for filing claims in securities fraud settlements. If the third-party advisor files the claim in its own name—not in the institutional investor's name—then we also need to determine the name of the beneficial owner of the securities so that we can get the information that we need. For that reason, we asked the three settlement administrators to search their databases not only for those claims filed by institutional investors in their own names, but also for third-party advisor claims that identified the institutional investors as the beneficial owners. We were informed that they would provide us with lists designating such beneficial owners.

One of the settlement administrators, who we will call Admin One, made the comparisons that we asked for for a group of forty-one sample companies and sent us a spreadsheet listing all of the institutional shareholders that we had identified; whether they had made a claim or not; the size of the claim that they made, if any; and the amount of their recovery. Admin One advised us that they believed that they were able to accurately determine roughly 85% to 90% of the time whether the institutions that we had identified as potential claimants had made claims or not. They reported that they believed, based on their prior experience in administering settlements, that the third-party advisors probably omitted to provide complete information about the beneficial ownership of some subset of the remaining 10% to 15% of the institutions we identified. Thus, for the sample of companies that we

obtained from Admin One, we recognize that our data probably contain a reasonable number of omitted claims. We cannot correct the data for this problem without additional information from the institutional investors themselves.

The other two settlement administrators, Admin Two and Admin Three, gave us different sets of information. Admin Two provided us with two sets of data about eleven sample companies: the first was a summary list of all claimants, including the size of their losses and amounts of their awards; the second was a more detailed listing of the particulars of each claimant's trading in the sample company's securities during the class period. Using this information, we were able to pull out a list of institutional investors making claims and the size of their claims that we compared to our data on the institutional investors that were eligible to make claims in these cases. As with the data provided by Admin One, there are undoubtedly some claims misidentified as being made by third-party advisors, which should be classified as being made by institutions. We anticipate this error to affect our sample data for the same reasons given by Admin One. We note that we were unable to identify as many of the beneficial owners for claims filed by banks acting as custodians in the Admin Two data set because of the way the data were given to us. This will have the effect of decreasing the number of (usually small) claimants that we can identify because their claims are filed by the banks that are the custodians for their shares.[43]

Admin Three provided us only with a list of the largest 100 actual claimants for a sample of ten companies. We should be able to compare this list with the data that we had assembled on institutional investor holdings. However, we cannot determine for those institutions whose names do not appear on the list of the largest claimants if they actually filed claims. At the time of this writing, Admin Three has not provided us with any further data in this regard to this point. As a result, we decided to wait until we received more information from Admin Three before continuing to work with their data.

### B. Preliminary Analysis

From the data provided by Admin One and Admin Two, we were able to perform some preliminary statistical analysis. Despite the differences in the

---

83.  To make the data more comparable between the Admin One and Admin Two data sets, we will need to aggregate all of the beneficial owners claiming through banks in the Admin One data set. Although this will reduce the number of identified claimants, it will result in creating comparable numbers of institutional investor claims.

two data sets, we extracted similar sets of results from them. For both samples, all of the settlements involved purchaser classes. We were able to determine the number of Form 13F filers that had reported purchases during the sample period and to compare that list with the names of the beneficial owners that were filing claims in the settlements. Thus, we are able to calculate the percentage of Form 13F traders that file claims in each settlement. Table 2 sets forth this information by sample company, as well as data on the average size of the claim for each institution that filed a claim. We note that we have incomplete information on several of the companies (indicated by dashes and not included in the totals for any of the columns).

Table 2

ADMIN ONE DATA ON SETTLEMENTS; 13F DATA ON FILING

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Av. Loss (dollars) |
|---|---|---|---|---|
| 1 | 4 | 22 | 18.18% | 29,813 |
| 2 | 121 | 265 | 45.66% | 19,640 |
| 3 | 3 | 29 | 10.34% | 102,466 |
| 4 | 2 | 76 | 2.63% | 13,998 |
| 5 | 1 | 41 | 2.44% | 55,975 |
| 6 | 71 | 312 | 22.76% | 26,317 |
| 7 | 0 | 13 | 0% | ——— |
| 8 | 4 | 47 | 8.51% | 8,049 |
| 9 | ——— | ——— | | |
| 10 | 9 | 73 | 12.33% | 328,006 |
| 11 | 11 | 83 | 13.25% | 54,152 |
| 12 | ——— | ——— | | |
| 13 | 25 | 76 | 32.89% | 215,947 |
| 14 | 12 | 108 | 11.11% | 10,178 |
| 15 | 7 | 22 | 31.82% | 166,915 |
| 16 | ——— | ——— | | |
| 17 | 2 | 35 | 5.71% | 270,811 |
| 18 | 2 | 12 | 16.67% | 39,522 |
| 19 | ——— | ——— | | |
| 20 | 20 | 54 | 37.04% | 137,309 |
| 21 | ——— | ——— | ——— | ——— |
| 22 | ——— | ——— | ——— | ——— |
| 23 | ——— | ——— | ——— | ——— |

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Av. Loss (dollars) |
|---|---|---|---|---|
| 24 | 221 | 820 | 26.95% | 45,912 |
| 25 | 601 | 1,345 | 44.68% | 2,551 |
| 26 | 180 | 452 | 39.82% | 5,983 |
| 27 | 5 | 19 | 26.32% | 17,467 |
| 28 | 0 | 6 | —— | —— |
| 29 | 31 | 145 | 21.38% | 38,450 |
| 30 | 0 | 8 | —— | —— |
| 31 | 1 | 47 | 2.13% | 26,371 |
| 32 | 39 | 180 | 21.67% | 218,139 |
| 33 | 0 | 18 | —— | |
| 34 | 1 | 13 | 7.69% | 775,395 |
| 35 | 15 | 54 | 27.78% | 2,228 |
| 36 | —— | —— | | |
| 37 | 4 | 49 | 8.16% | 31,915 |
| 38 | 0 | 4 | —— | —— |
| 39 | 12 | 37 | 32.43% | 133,270 |
| 40 | 385 | 961 | 40.06% | 5,803 |
| 41 | 2 | 34 | 5.89% | 91,463 |
| 42 | 0 | 4 | —— | —— |
| | | | | |
| Total/Averages | 1,791 | 5,464 | 32.78% | 102,644 |

The Admin Two data gave us a slightly different look at the settlement process. They provided us disaggregated data on all of the claims made in each of the settlements, although they did not match our list of Form 13F filers with their database for us. While there remains much analysis to be done on the information they provided us, at this point we choose to generate results that are comparable in nature to those shown above. In Table 3, we present the same percentage of Form 13F traders that filed claims in each settlement, as well as data on the average size of the claim made by each institution.

Table 3

ADMIN TWO DATA ON SETTLEMENTS; 13F DATA ON FILING

| Sample Company Number | Number Filing | Number Trading | Percentage Filing | Average Loss (dollars) | Recovery Percentage | Average Award (dollars) |
|---|---|---|---|---|---|---|
| 1 | 2 | 7 | 28.6% | 263,050 | 18.89% | 46,690 |
| 2 | 11 | 60 | 18.5% | 705,275 | 48.79% | 344,104 |
| 3 | 8 | 27 | 29.6% | 356,448 | 5.25% | 18,714 |
| 4 | 2 | 8 | 25.0% | 127,500 | 49.26% | 62,807 |
| 5 | 0 | 1 | 0% | — | N/A | — |
| 6 | 8 | 51 | 15.7% | 150,507 | 12.12% | 18,241 |
| 7 | 14 | 55 | 25.5% | 48,227 | 23.91% | 11,531 |
| 8 | 7 | 25 | 28.0% | 322,971 | N/A | N/A |
| 9 | 13 | 50 | 26.0% | 657,216 | 5.84% | 38,281 |
| 10 | 17 | 90 | 18.89% | 1,919,254 | N/A | N/A |
| 11 | 37 | 144 | 25.69% | 60,289 | 100.23% | 60,428 |
| | | | | | | |
| Total/ Averages | 119 | 517 | 23.01% | 461,074* | 33.04%** | 75,112** |

\* Excluding Case 5.
\*\*Excluding Cases 5, 8 and 10.

The most obvious result that can be seen in Tables 2 and 3 is the low percentage of Form 13F traders that appear to file claims in these settlements. Looking at the last row of each table, we have calculated the averages across all of the settlements in the two samples to give the reader a flavor of the data. Looking across this row in Table 2, we find an average filing percentage for eligible claims of 32.78%, whereas in Table 3, the average percentage of Form 13F filers perfecting their claims is 23.01%.[84] If all those institutions filing Form 13Fs indicating trades during the class period were also filing and perfecting claims in these settlements, we would see 100% averages here.

Average loss is substantial in both samples. For Table 2, the average loss is $102,644; in Table 3, the average loss is $461,074. Although there are some large variations across the different settlements, the magnitude of these averages would seem to indicate that many institutions have suffered significant losses in these cases. Of course, what determines the value of filing a claim is not the loss suffered, but the recovery expected. Here, our

---

84.  Note that this is the percentage of filers whose claims are filed and accepted as valid by the settlement administrators. At present, we are not calculating the percentage of 13F filers who file claims that are disallowed. Based on our review of the data, adding these ineligible claimants would slightly increase the number of filers in some settlements.

data is less complete, as we are only able to calculate average awards for the settlements in Table 3. With due regard for the small number of settlements in this group, we can see that average recovery rates are about one-third of losses, resulting in an average award for those eight companies of $75,112. To our eyes, this would seem to be a significant return on the small costs (in terms of time and money) of filing a claim in a securities fraud class action settlement.

One implication of the recovery percentages in the Admin Two data set should also be pointed out. As these percentages are for the most part below 100%, increasing the number of claims filed by institutional investors will result in lower average recoveries for all of these investors. This will have the effect of reducing the monetary incentives for these shareholders to file claims, although we cannot be sure by how much.

We repeat again that caution must be exercised in interpreting these numbers. While we are sure that there is some under-reporting of claimants due to problems in determining with complete accuracy the identities of the institutions filing claims in the settlements, we believe, based on our conversations with the settlement administrators, that their process accurately identifies a high percentage of the beneficial owners that file in these settlements. In addition, the Form 13F data itself may be inaccurate, although we note in this regard that institutions that fail to file Form 13Fs are not included in our sample. In fact, we only include those institutions that report their purchases during the class period, which should understate the number of institutions that could file claims in the settlements because it excludes institutions that traded during the class interval but failed to timely report these trades on their Form 13Fs. Thus, we believe that we have been conservative in selecting the trading institutions that we are seeking to match up with the filing institutions in the settlements. Of course, we would prefer to correct for these problems before concluding that our results will hold up, but at this point, we do not see how we can make these corrections without getting information from the institutions themselves, assuming that the information still exists and that the institutions would be willing to share it.

## V. WHY AREN'T INSTITUTIONS FILING?: A RESEARCH AGENDA

We have attempted to answer the question of whether institutional investors are leaving money on the table by failing to file claims in securities fraud class actions. We think that their fiduciary duties to file such claims are

clearly established by existing law[85] and that the costs of filing such claims are likely to be trivial. Thus, even if the benefits from filing are small, institutional investors should be filing claims in these settlements.

We conclude that it appears that many of these investors are failing to file such claims. Despite all of the flaws in our data, the percentage of institutional investors that we can identify that are actually filing such claims is well below the number that should be filing these claims. At the same time, the average recoveries in these settlements seem well in excess of what would cover the costs of making such claims. While we are well aware that there are those in the field that believe otherwise—and we stand ready to be convinced by further evidence—we think that we have offered the most complete picture of the problem to date.[86]

What we lack most at the moment is a convincing explanation of why these institutions are not filing claims in all securities fraud class action settlements. Two potential explanations have been offered: first, that there are potential misunderstandings by institutions of the amount that they can recover in these cases;[87] and second, that these shareholders do not understand that filing claims is part of their legal duty to their beneficiaries.[88]

Based on comments that we have received from attorneys that practice in the area, and based on our own research, we think that there are several more plausible hypotheses that should be explored. One strong candidate as an explanation is that institutions are rational economic beings that make cost-benefit calculations concerning whether or not to file claims in these settlements. They may expect to receive small recoveries in these cases, even if their losses are large, because some settlements pay out only pennies on the dollar. Or the recovery amounts may seem large to outsiders but may be very small in relationship to the size of the institutions' portfolios and therefore have no material impact on their returns. We think that this is an important avenue for further research that we intend to pursue. In particular, we need to inquire further into the underlying claims for the different institutions to look at the distribution of claims, and we need to ask such questions as whether

---

85. It bears repeating that the Form 13F filers are a diverse lot. They are not restricted to large public pension funds that are often discussed when considering shareholder activism, nor even to institutions that have fiduciary obligations to a set of beneficial owners. We hope to refine our results to try to sort out the different types of institutions into different categories as we work further with the data that we have and hope to get in the future.

86. We note that our results are consistent with those in the only other systematic attempt to address this issue of which we are aware. See, e.g., Cleveland, supra note 79.

87. Douglas McKeige, Leaving Money on the Table: Are You Collecting on Your Claims?, 3 INSTITUTIONAL INVESTOR ADVOCATE 1 (2001).

88. Cleveland, supra note 79.

the average figures reported in Tables 2 and 3 conceal a large number of small claimants for whom filing will result in small gains. We also need to look at the average recoveries for those institutions that did not file claims in order to calculate what they would have recovered if they had filed. Furthermore, we intend to get a better handle on the costs of filing claims and whether these costs vary significantly over different investors with different trading volumes and patterns. We also intend to consider the level of detail that is required for perfecting the claims. More generally, we intend to examine the effect of the size of the settlement, the size of the individual institution's potential recovery, the size of the institution's stake in the company being sued in the case, the size of the case (including how well publicized the settlement is), and the length of time between the settlement and the time that the claims arose. All of these are important factors in determining filing rates for institutional investors.

A second potentially important explanation for the institutions' failure to file claims is that they do not have personnel that are assigned to handle these claims. In other words, if the notice of settlement comes in, who does it get routed to? If it goes to the trading desk, the traders may believe that their job is to make money for the firm through the purchase and sale of securities, not by filing claims. Thus, they may do nothing with the claim. Similarly, if the institutional investor is delegating the responsibility for filing claims to the custodian of their securities, typically a bank or broker, the custodian may fail to understand what it needs to do in order to file and perfect a claim. Many potential pitfalls of this nature may exist at different institutions and play a major role in explaining their failures to file.

A third possible reason for institutions' failure to file claims may be that they never receive the notices of settlement. Most institutions hold their stock in street name, with the beneficial owners holding legal title through a depository trust.[89] When a company settles a securities fraud case, the notice of settlement must filter its way through the chain from the depository trust, to the broker or bank holding the shares in the institution's name, all the way down to the institutional investor. There is no legal obligation imposed on the banks or brokers to insure that these notices arrive at the door of the institutional investors.[90] So we cannot be sure that institutions are even aware of the settlements when they arise.

---

89. Thomas & Dixon, *supra* note 68.
90. If it turns out that many notices are not being received by the institutions, then it may be necessary for the SEC to consider implementing rules that require banks and brokers to forward these notices to all the beneficial holders whose shares that they hold. New rules analogous to those adopted for shareholder voting would seem to be in order. *See* Thomas & Dixon, *supra* note 68.

These potential explanations for institutional investors' failure to file calaims in securities fraud class action settlements may also be complementary. In other words, some institutions may decide not to file because the returns are too small, others may not file because they are not receiving notice of the settlements, and a third group may not have personnel assigned to process claims.

The policy implications of our results depend importantly on which hypotheses are correct and if so, what the costs and benefits are of addressing them. For example, it might be relatively cheap for the SEC to draft rules to address widespread failures in the system that notify institutions of class action settlements. It would be more costly to require institutions to assign personnel to process claims in these settlements. Finally, it may or may not be even more expensive to create a legal duty to file claims even where the dollar amounts of the claims are low. We look forward to addressing these issues more fully in later research.